UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

COURTNEY ROGALSKI and
WESTLEY MCNEAL,

                          Plaintiff(s),

        v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, et al.,

                          Defendant(s).

Case No. 2:15-CV-1821 JCM (VCF)

ORDER

        Presently before the court is defendants' Las Vegas Metropolitan Police Department ("LVMPD"), Detective Jeffrey Tabor, Sergeant Roderick Hunt, Lieutenant Dennis Flynn, and Officer Willis Sylva motion for partial summary judgment.  (ECF No. 25).  Plaintiffs Courtney Rogalski ("Rogalski") and Westley McNeal ("McNeal") filed a response and errata (ECF Nos. 35, 36), to which defendants replied (ECF No. 39).

**I.     Facts**

        This case arises from the search of Rogalski's residence and the August 30, 2013, arrest of Rogalski and McNeal, Rogalski's boyfriend.  (ECF No. 10 at 2, 6–7).  The case also involves McNeal's December 28, 2013, traffic stop.  (ECF No. 10 at 8).

        On May 17, 2013, Det. Tabor began conducting surveillance on Advanced Gardens Hydroponics located at 7850 Dean Martin.[1]  (ECF Nos. 10 at 3, 6–7, 27-1 at 25).  During his surveillance of the business, Det. Tabor witnessed a vehicle park at the business and saw the driver

---

        [1]  The parties do not specify whether the store is located on Dean Martin Avenue, Street, Drive, or an alternative roadway.

James C. Mahan
U.S. District Judge

exchange a fifty (50) pound $CO_2$ tank. (ECF No. 10 at 3). Det. Tabor followed the vehicle once it left the business but terminated surveillance when the vehicle entered a gated community. (*Id.*).

According to a records check, the vehicle was registered to Rogalski. (*Id.*).

Then, approximately three (3) months after Det. Tabor's surveillance, Det. Tabor obtained a power comparison of Rogalski's residence from Nevada Energy, which included the power usage of three other homes in Rogalski's neighborhood for comparison. (*Id.*). The power comparison revealed that Rogalski's residence was using "an average of 3,698 kilowatts more a month than the other three comparison houses." (*Id.* at 4).

Additionally, on August 27, 2013, Det. Tabor "drove past" Rogalski's residence and observed the windows "covered with a heavy white plastic material." (*Id.*). In the late evening hours of August 27, 2013, another LVMPD detective "walked past" Rogalski's residence and observed that Rogalski's residence was completely dark. (*Id.*).

Based on the information gathered during his surveillance, Det. Tabor drafted a search warrant for Rogalski's residence, and on August 29, 2013, Judge Cynthia Cruz signed the search warrant. (*Id.* at 2–3).

On August 30, 2013, detectives with LVMPD and LVMPD SWAT unit executed the search warrant at Rogalski's residence. (*Id.* at 2). Detectives found 382 grams of marijuana and thirty-two (32) marijuana plants, sixteen (16) of which were flowering, and the remaining sixteen plants (16) were immature. (*Id.*).

The detectives arrested Rogalski and McNeal. (*Id.*). Rogalski was charged with possession of a controlled substance and possession of a controlled substance with the intent to sell.[2] (*Id.*). However, the charges against Rogalski were eventually dismissed. (*Id.* at 3).

Thereafter, on December 28, 2013, McNeal was stopped by Lt. Flynn for speeding. (ECF Nos. 10 at 8, 26-2 at 17). McNeal alleges that Lt. Flynn pointed a gun at him and ordered McNeal to exit his vehicle. (ECF No. 10 at 8). McNeal was handcuffed, and Lt. Flynn searched McNeal's truck. (*Id.*). McNeal was eventually released with no citation. (*Id.*).

---

[2] The record is not clear as to whether charges were brought against McNeal or not, but it appears that no charges were filed against McNeal and that he was released from jail shortly after he was arrested. *See* (ECF No. 26-2 at 6–7).

**James C. Mahan**
**U.S. District Judge**

On October 2, 2015, plaintiffs filed their second amended complaint, asserting violations of constitutional rights and state law. (ECF No. 10). Plaintiffs allege the following claims: (1) and (2) violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Sgt. Hunt, Det. Tabor, Lt. Flynn, and Det. Sylva; (3) a *Monell* claim pursuant to 42 U.S.C. § 1983 against LVMPD; (4) negligence against all defendants; (5) false imprisonment against Det. Tabor and LVMPD; (6) malicious prosecution against Det. Tabor and LVMPD; and (7) intentional infliction of emotional distress ("IIED") against all defendants. (*Id.*).

On February 28, 2017, defendants filed the instant motion for partial summary judgment "on the claims related to the marijuana arrest and the actual traffic stop." (ECF No. 25 at 9).

## II.    Legal Standard

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). However, to be entitled to a denial of summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Moreover, "[i]n such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.*

By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential

James C. Mahan
U.S. District Judge

element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the non-moving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The Ninth Circuit has held that information contained in an inadmissible form may still be considered for summary judgment if the information itself would be admissible at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.")).

**III.   Discussion**

*A.   42 U.SC. § 1983 (claims 1 through 3)*

*1.   Qualified immunity*

When a plaintiff brings a claim under 42 U.S.C. § 1983, government officials sued in their individual capacities may raise the affirmative defense of qualified immunity. *See Spoklie v. Montana,* 411 F.3d 1051, 1060 (9th Cir. 2005). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Indeed, "[q]ualified

**James C. Mahan**
**U.S. District Judge**

immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

The doctrine protects government officials performing discretionary functions from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244. Qualified immunity may apply even if the defendant makes a mistake of law or acts based upon a mistake of fact. *Id.* at 231.

Deciding whether an officer is entitled to qualified immunity is a two-step inquiry. *Id.* at 232. First, the court assesses whether the plaintiff has alleged or shown a violation of a constitutional right. *Id.* Second, the court decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id*. The Supreme Court has instructed that district judges may use their discretion when deciding which qualified immunity prong to address first, based upon the circumstances of the case at issue. *See id.* at 236.

The second prong of the qualified immunity test requires a court to determine whether the right plaintiff claims was violated was "clearly established." *See id.* "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The dispositive question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

Further, "clearly established law" may "not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742

(2011)).[3] Indeed, "[w]ithout that 'fair notice,' an officer is entitled to qualified immunity." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015).

To be clear, "[w]here the defendant raises the affirmative defense of qualified immunity, the initial burden is upon the plaintiff to show that the rights were clearly established, after which the defendant bears the burden of proving that his conduct was reasonable." *Shoshone-Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42 F.3d 1278, 1285 (9th Cir. 1994) (citing *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991)).

Here, defendants have asserted qualified immunity regarding the search and arrests of Rogalski and McNeal and the later traffic stop of McNeal (*see* ECF No. 25 at 34); therefore, plaintiffs must first demonstrate that their rights were "clearly established" within the "particularized" factual context of the encounters. *See White*, 137 S. Ct. at 552 (quoting *Anderson*, 483 U.S. at 640); *see also Shoshone-Bannock Tribes*, 42 F.3d at 1285.

Instead, plaintiffs incorrectly state that defendants shoulder the initial burden of showing qualified immunity. *See* (ECF No. 35 at 21). Regardless, plaintiffs assert the following arguments to ward off defendants' invocation of qualified immunity, and the court will address the arguments as they relate to the two incidents at issue. *See* (*id.*).

### i. Marijuana home search and arrests[4]

Upon review of plaintiffs' response, the court concludes that plaintiffs have failed to surmount their burden. Plaintiffs do not apply case law to the factual circumstances of the search and arrest that occurred on August 30, 2013.[5] In particular, plaintiffs allege their Fourth and

---

[3] The Court, in *al-Kidd*, explicitly noted that it "ha[d] repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." 563 U.S. 731, 742 (2011) (citation omitted).

[4] The court takes judicial notice of the references to Rogalski's granted petition of writ of habeas corpus. *See* (ECF Nos. 27 at 7–8, 35 at 8). However, Rogalski fails to provide the court with a case number or other identification so that the writ may be reviewed. Additionally, the court, through its own research, was unable to find any writ of habeas corpus as it relates to Rogalski.

[5] Specificity in the qualified immunity context is important because "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *White*, 137 S. Ct. at 552 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)) (internal quotation marks omitted).

Fourteenth Amendment rights were violated, but they fail to specify how those constitutional rights were violated during the search of Rogalski's residence and their arrests. *See* (ECF Nos. 10 at 8–9, 35 at 21–22).

Additionally, plaintiffs argue that "it was clearly established at the time of Tabor's initiation of [p]laintiffs' prosecution that it was unlawful to prosecute a [p]laintiff with malice and without probable cause for the purpose of denying the plaintiff constitutional rights." (ECF No. 35 at 22). In support, plaintiffs cite to *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1065 (9th Cir. 2004).

However, *Awabdy* involves a motion to dismiss a § 1983 claim of malicious prosecution regarding the alleged embezzlement of public funds and claims that the First and Fourteenth Amendments were violated by restraint on political activity and racial animus. *Id.* at 1065–71. Because *Awabdy* does not mirror the specific factual circumstances of this one, plaintiffs have failed to support this argument with applicable case law. *See White*, 137 S. Ct. at 552.

Therefore, Det. Tabor and Sgt. Hunt are entitled to qualified immunity as to the alleged § 1983 claim against them.[6]

### ii. *McNeal's traffic stop*

Next, McNeal asserts that Lt. Flynn and Det. Sylva violated his Fourth Amendment "right to be free from unreasonable search and seizure" during a traffic stop on December 28, 2013. (ECF No. 10 at 8).

Lt. Flynn and Det. Sylva contend that the only genuine issue of material fact that remains for trial is whether excessive force was used during the traffic stop on December 28, 2013. (ECF No. 25 at 35). However, Lt. Flynn argues that he is entitled to qualified immunity as it relates to every other aspect of the traffic stop, and Det. Sylva contends that he is entitled to qualified immunity regarding the traffic stop, especially because he had no involvement with the alleged excessive force. (*Id.*).

---

[6] Sgt. Hunt was involved in the execution of the search warrant at Rogalski's residence. *See* (ECF No. 27-2 at 11).

*a. Asserted facts*

In the afternoon of December 28, 2013, McNeal was under surveillance after he left a hydroponics store, which the officers suspected was a marijuana grow store. (ECF No. 27-3 at 6). The surveillance team witnessed McNeal purchase "a larger $CO_2$ cannister [sic]" and "load[] some other items in the truck [detectives] believed would be indicative of something that would support something much larger than the statute of seven plants." (*Id.* at 7).

As an officer continued to follow McNeal, McNeal was seen stopping at Bank of America, Home Depot, and the Watermill "getting clean water." (*Id.* at 7, 13). During the surveillance, the undercover officers ran the vehicle registration.[7] (*Id.* at 7). Additionally, the officer tailing McNeal indicated over the radio that he believed McNeal was aware that he was being followed. (*Id.*). Based on the information gathered, Lt. Flynn was instructed that if probable cause existed "to make a car stop on [McNeal]." (*Id.*).

Lt. Flynn observed McNeal driving ten miles over the posted speed limit and initiated a traffic stop. (*Id.* at 8). Lt. Flynn indicates that he attempting to keep the stop "nonchalant" because "all [he] wanted to do was get [McNeal's] identification." (*Id.*). However, when Det. Sylva pulled up to the scene, Lt. Flynn was surprised and attempted to come up with a reason as to why another officer would show up. (*Id.*). Therefore, Lt. Flynn further states that he decided to utilize a "ruse" of a burglary in the area because Det. Sylva, also in an unmarked car and civilian clothing, pulled up to the stop and a police helicopter was flying nearby.[8] (*Id.*).

Based on the ruse, McNeal was then ordered out of the vehicle and placed in handcuffs. (ECF Nos. 26-2 at 18–20, 27-3 at 8). Lt. Flynn proceeded to search McNeal's person and truck looking for burglary tools, while Det. Sylva called Rogalski. (*Id.*).

Once Lt. Flynn and Det. Sylva were done with their questions, Lt. Flynn told McNeal he was free to go and did not cite McNeal for speeding. (ECF Nos. 26-2 at 19, 27-3 at 9).

---

[7] The record indicates, without clarity, that the truck came back as registered to a female. (ECF No. 27-3 at 6–8, 21). Additionally, the record is unclear as to when the registered owner's name was known. (ECF No. 27-3 at 6–8).

[8] Later on in Lt. Flynn's deposition, he states, "[he] did not want [McNeal] to know the real reason that we were out there conducting marijuana potential grow operation enforcement." (ECF No. 27-3 at 13).

James C. Mahan
U.S. District Judge

- 8 -

*b. Analysis*

A traffic stop by a police officer is "a seizure within the meaning of the Fourth Amendment." *United States v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000). As a result, "[s]uch a stop is subject to the constitutional requirement that it not be unreasonable." *Id.*

Further, in the context of a traffic stop, the duration of a traffic stop shall not exceed the time needed to complete "the seizure's mission, [which is] to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citations and quotation marks omitted). However, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop[,]" but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

The court will analyze each aspect of the traffic stop and consider the constitutionality of Lt. Flynn and Det. Sylva's conduct throughout the stop to determine if McNeal's Fourth Amendment rights were violated.

First, on December 28, 2013, Lt. Flynn lawfully stopped McNeal for driving ten miles over the speed limit. *See Ohio v. Robinette*, 519 U.S. 33, 38 (1996) (noting officer had "probable cause to stop [a driver] for speeding."); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); (ECF No. 27-3 at 7).

Additionally, ordering a driver to exit his vehicle during a routine traffic stop does not violate the driver's Fourth Amendment rights. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). In *Mimms*, the Supreme Court held that because an officer had already lawfully detained the driver, the *de minimis* intrusion of having the driver step out of the vehicle does not violate the driver's Fourth Amendment rights. *Id.* Therefore, Lt. Flynn lawfully ordered McNeal to exit his vehicle during the December 28, 2013, traffic stop.

However, the first issue arises when McNeal alleges that Lt. Flynn pointed a gun at him as Lt. Flynn approached McNeal's vehicle and ordered him to exit the vehicle at gun point. (ECF No. 26-2 at 18). In contrast, Lt. Flynn disputes that he pointed a gun and yelled expletives at

McNeal during the December 28, 2013, traffic stop, but he concedes that the issue of whether excessive force was used during that traffic stop is a genuine issue of material fact which will remain for trial. *See* (ECF No. 25 at 35).

Accordingly, the court recognizes the challenges inherent in proving a negative, such as Lt. Flynn having to show that he, in fact, did not point a gun at McNeal. *See Weimerskirch v. C. I. R.*, 596 F.2d 358, 361 (9th Cir. 1979). Consequently, a genuine issue of material fact exists as to whether force was used, producing an unreasonable seizure during the December 28, 2013, traffic stop.

Next, another issue arises regarding Lt. Flynn's decision to prolong the initial traffic stop. In order for an officer to expand the scope of a traffic stop, an officer's decision must be supported by reasonable suspicion. *Rodriguez*, 135 S. Ct. at 1615. For reasonable suspicion to be present, "an officer must have specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011).

Here, based on the totality of the circumstances, Lt. Flynn was not justified in prolonging the initial traffic stop. As previously mentioned, *supra*, Lt. Flynn wanted to identify the driver of the truck. After the time passed to identify the driver, McNeal, the mission of the seizure had ended, especially because Lt. Flynn did not provide any reasonable suspicion of criminal activity. *See Rodriguez*, 135 S. Ct. at 1614. In fact, Lt. Flynn is inconsistent as to when he identified McNeal.[9] Lt. Flynn justifies initiating the ruse because Det. Sylva appeared and a police helicopter was flying nearby (*see* ECF No. 27-3 at 8), which does not support the reasonable suspicion of criminal activity needed to prolong a traffic stop.

Assuming, *arguendo*, that Lt. Flynn prolonged the traffic stop to investigate a potential marijuana grow operation based on the information gathered during the surveillance of McNeal, Lt. Flynn is not justified in prolonging the initial traffic stop. Without Lt. Flynn specifying the size of the $CO_2$ canister and what the "other items" were, Lt. Flynn's decision to commence a ruse

---

[9] The record is unclear as to whether Lt. Flynn learned who McNeal was during the traffic stop or after the traffic stop. (ECF No. 27-3 at 6, 8, 10).

James C. Mahan
U.S. District Judge

was not based on specific, articulable facts.[10]  Instead, the decision appears to be merely based on a hunch, particularly because Lt. Flynn does not indicate that he smelled marijuana or that he saw marijuana paraphernalia.

Therefore, Lt. Flynn and Det. Sylva detaining McNeal in an extended manner was not reasonable.  *Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (The Fourth Amendment "requires that the government and its agents act reasonably." (emphasis removed)).

Furthermore, the Ninth Circuit has identified certain situations in which a person may be lawfully handcuffed during an investigatory stop:

> (1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; (2) where the police have information that the suspect is currently armed; (3) where the stop closely follows a violent crime; and (4) where the police have information that a crime that may involve violence is about to occur.

*Hartrim v. Las Vegas Metro. Police Dep't*, 603 F. App'x 588, 588 (9th Cir. 2015) (quoting *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1176 (9th Cir. 2013)).  Upon review of the record, the "handcuffing" of McNeal was unreasonable.  *See id*.  Indeed, both parties appear to agree that McNeal cooperated with Lt. Flynn in exiting the vehicle and answering Lt. Flynn and Det. Sylva's questions.  (ECF Nos. 26-2 at 18–19, 27-3 at 9).

Additionally, the record does not indicate that McNeal possibly had a weapon or was going to flee the scene.[11]  Lt. Flynn or Det. Sylva do not suggest that their safety was at risk when

_____

[10]  The court acknowledges that McNeal states that he "loaded a 50 pound $CO_2$ tank into [his] truck, along with a couple bails of dirt" on December 28, 2013.  (ECF No. 26-2 at 17).  However, Lt. Flynn does not assert that he is aware that the $CO_2$ tank is a 50 pound tank or that the large items are dirt.  Further, Lt. Flynn does not indicate exactly why those items are indicative of an illegal marijuana grow operation.

[11]  Lt. Flynn created a ruse to further investigate McNeal, but Lt. Flynn was aware that McNeal was not in fact involved in a burglary:

> I used a ruse. I lied to him. I intentionally lied to him, and I told him that the reason I stopped him was true because he was speeding, but I told him there also had been had a burglary in the area and that his vehicle matched the description of the burglary.

(ECF No. 27-3 at 8).  Therefore, justification for the stop following a violent crime would also fail.

James C. Mahan
U.S. District Judge

1    approaching McNeal or that either of them received information indicating their safety may be at

2    risk.  *See* (ECF No. 27-3 at 7–8).  Based on the record, the decision to handcuff McNeal does not

3    appear to be "a reasonable response to legitimate safety concerns on the part of" either officer

4    involved.  *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001).

5            Lastly, the court will address whether McNeal gave Lt. Flynn consent to search his truck.

6    Lt. Flynn claims McNeal gave verbal consent to search his truck.[12]  However, McNeal contends

7    that he never gave Lt. Flynn consent to search his vehicle.  (ECF No. 26-2 at 20).  Therefore, the

8    issue of whether McNeal gave Lt. Flynn consent to search his truck is a genuine issue of material

9    fact that will remain for trial.

10           Based on the foregoing, a genuine issue of material fact remains as to whether excessive

11   force was used by Lt. Flynn during a traffic stop on December 28, 2013.  Moreover, the question

12   of force does not change the fact that McNeal's Fourth Amendment right against unlawful search

13   and seizure was clearly established at the time McNeal was placed in handcuffs and his truck was

14   searched.  Thus, Lt. Flynn is not entitled to qualified immunity as it relates to the violation of

15   McNeal's Fourth Amendment right from illegal search and seizure.  Det. Sylva is also not entitled

16   to qualified immunity as it relates to the handcuffing of McNeal.[13]

17                            *2.  Monell liability*[14]

18           The principal framework governing municipal liability in § 1983 actions was established

19   in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Under *Monell*, municipal liability must be

20   based upon the enforcement of a municipal policy or custom, not upon the mere employment of a

21   constitutional tortfeasor.  *Id.* at 691.  Therefore, in order for liability to attach, four conditions must

22   be satisfied:  "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2)

23   _____

24           [12]  In Lt. Flynn's deposition, he claims McNeal said, "[y]ou guys can check," after Lt.
25   Flynn questioned him about whether McNeal had any tools in his vehicle.  (ECF No. 27-3 at 8).

26           [13]  Although defendants' motion asserts Lt. Flynn handcuffed McNeal, Det. Sylva stated
     in his deposition that, "I believe I cuffed him."  (ECF No. 27-3 at 26).

27           [14]  According to plaintiffs' complaint and response to defendants' motion, plaintiffs'
28   *Monell* liability claim applies to the search and arrests of plaintiffs on August 30, 2013; therefore,
     the court will analyze plaintiffs' *Monell* claim as it relates to the search and arrests on August 30,
     2013.  *See* (ECF Nos. 10 at 9–11, 35 at 21)

that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996).

"To prevent municipal liability . . . from collapsing into respondeat superior liability," federal courts must apply "rigorous standards of culpability and causation" in order to "ensure that the municipality is not held liable solely for the actions of its employees." *Bd. of Cnty. Comm. of Bryan City v. Brown*, 520 U.S. 397, 405, 410 (1997). Thus, a municipality will only be liable when the "execution of a government's policy or custom . . . inflicts the injury . . . ." *Monell*, 463 U.S. at 694.

"Proof of random acts or isolated events" does not fit within *Monell*'s meaning of custom. *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989), *overruled on other grounds*, *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010). Indeed, "[o]nly if a plaintiff shows that his injury resulted from a 'permanent and well-settled' practice may liability attach for injury resulting from a local government custom." *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970))).

It is well settled in the Ninth Circuit that a plaintiff generally cannot establish a *de facto* policy with a single constitutional violation. *See, e.g.*, *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). Instead, a plaintiff's theory must be founded upon practices of "sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also McDade v. West*, 223 F.3d 1135 (9th Cir. 2000).

Here, defendants argue that LVMPD's policies are constitutional and that plaintiffs allege conclusory allegations without any evidence to support their claim. (ECF No. 25 at 33).

In response, plaintiffs argue that LVMPD's High Intensity Drug Task Force frequently ignores Nevada's medical marijuana laws. (ECF No. 35 at 21). As a result, plaintiffs argue that "LVMPD has a *de facto* policy of disregarding the will of Nevada's electorate who affirmatively chose to allow medical marijuana in 2002." (*Id.*).

Although plaintiffs argue that LVMPD does have a *de facto* policy, plaintiffs fail to provide sufficient evidence to support their allegation. Plaintiffs point to a pending case to support their argument that Sgt. Hunt and Det. Tabor's actions are not an isolated incident. (ECF No. 35 at 21). However, plaintiffs ultimately fail to connect the supposed policy or custom to a specific violation of an articulated constitutional right.

Because plaintiffs failed to demonstrate any custom or policy held by LVMPD that led to the deprivation of plaintiffs' constitutional rights, summary judgment will consequently be granted in favor of defendant LVMPD with respect to plaintiffs' *Monell* claim.

### B. State law claims (claims 4 through 7)

Plaintiffs bring claims for negligence, false imprisonment, malicious prosecution, and intentional infliction of emotional distress under Nevada state law.[15]

#### 1. Negligence against all defendants

To prevail on a claim for negligence, a plaintiff must generally show that: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiff's injury; and (4) the plaintiff suffered damages." *Scialabba v. Brandise Const. Co., Inc.*, 921 P.2d 928, 930 (Nev. 1996). Under Nevada law, the questions of proximate cause and reasonableness presented by a negligence claim usually advance questions of fact for the jury. *Frances v. Plaza Pacific Equities*, 847 P.2d 722, 724 (Nev. 1993).

Defendants argue that they are shielded from liability as to plaintiffs' negligence claim by the principle of discretionary immunity, codified by Nevada Revised Statute ("NRS") § 41.032.

Nevada has waived its general state immunity under NRS § 41.031. The state's waiver of immunity is not absolute; the state has retained a "discretionary function" form of immunity for officials exercising policy-related or discretionary acts. *See* Nev. Rev. Stat. § 41.032.[16]

---

[15] The court has jurisdiction over the state law claims here under 28 U.S.C. § 1367.

[16] NRS § 41.032 states in relevant part that no action may be brought against a state officer or official which is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions . . . whether or not the discretion involved is abused." Nev. Rev. Stat. § 41.032(2).

In 2007, the Nevada Supreme Court adopted the United States Supreme Court's *Berkovitz-Gaubert* two-part test regarding discretionary immunity. *See Martinez v. Maruszczak*, 168 P.3d 720, 722, 728–29 (Nev. 2007). Under Nevada law, state actors are entitled to discretionary-function immunity under NRS § 41.032 if their decision "(1) involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." *Id.* at 729. "[F]ederal courts applying the *Berkovitz-Gaubert* test must assess cases on their facts, keeping in mind Congress' purpose in enacting the exception: to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *See id.* at 729 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984) (internal quotation marks omitted)).

Police officers "exercise[ ] discretion and [are] thus generally immune from suit where the act at issue require[s] 'personal deliberation, decision, and judgment,' rather than 'obedience to orders, or the performance of a duty in which the officer is left no choice of his own.'" *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168 (9th Cir. 2014) (citing *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007)). In particular, "[a]n officer's decision as to how to accomplish a particular seizure or search is generally considered a discretionary determination under Nevada law, and officers are therefore immune from suit as to state law claims arising therefrom in most cases." *Davis*, 478 F.3d at 1059. However, "where an officer's actions are attributable to bad faith, immunity does not apply whether an act is discretionary or not." *Id.* (quoting *Falline v. GNLV Corp.*, 823 P.2d 888, 891–892 (Nev.1991)).

As an initial matter, with respect to LVMPD, this court has specifically held that Nevada's discretionary-function immunity statute, NRS § 41.032(2), bars claims for negligent hiring, training, and supervision. *See Beckwith v. Pool*, no. 2:13-cv-125-JCM-NJK, 2013 WL 3049070, at *5–6 (D. Nev. June 17, 2013); *see also Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170, 1192 (D. Nev. 2008) ("Because Nevada looks to federal case law to determine the scope of discretionary immunity, and because federal case law consistently holds training and

James C. Mahan
U.S. District Judge

supervision are acts entitled to such immunity, LVMPD is entitled to discretionary immunity . . . .").

Discretionary-function immunity, therefore, applies to the LVMPD with respect to the state negligence claim. Summary judgment will therefore be granted in favor of defendant LVMPD with respect to plaintiffs' fourth cause of action.

For the remaining defendants, the court will address each incident at issue and determine whether discretionary immunity applies to defendants.

### i.    *Marijuana search and arrests*

Here, defendants Sgt. Hunt and Det. Tabor are entitled to discretionary immunity for their decisions in executing the search warrant at Rogalski's residence and the subsequent arrests of Rogalski and McNeal. *See Sandoval*, 756 F.3d at 1168. The act at issue required defendants' personal judgment and decision in deciding whether to attain a search warrant and arrest plaintiffs' based on what was found when the warrant was executed. *See id.*

Det. Tabor acquired sufficient evidence to obtain a search warrant and found more marijuana than what was allowed in NRS § 453A.200(3)(b). The record does not indicate any bad faith on the part of Det. Tabor in obtaining the search warrant, or on part of Sgt. Hunt in executing the search warrant. Therefore, Det. Tabor and Sgt. Hunt are entitled to discretionary immunity as to plaintiffs' negligence claim.

Accordingly, summary judgment will be granted in favor of Sgt. Hunt and Det. Tabor with respect to plaintiffs' negligence claim.

### ii.    *Traffic stop*

Where an officer willfully or deliberately disregards the rights of a particular citizen during the arrest or search of that citizen, the officer's conduct results or is done in bad faith, and thus, the officer is not entitled to discretionary immunity. *Davis*, 478 F.3d at 1060. Here, with a genuine issue of material fact as to the use of excessive force at the December 28, 2013, traffic stop, the court cannot determine at summary judgment whether Lt. Flynn's actions constitute bad faith. *See id.* (Summary judgment is not appropriate where disputed issues of material facts exist with respect

to whether an officer's conduct was in bad faith.). Thus, Lt. Flynn's entitlement to discretionary immunity is left for a jury to decide.

In contrast, Det. Sylva's involvement with the December 28, 2013, traffic stop is limited to handcuffing McNeal. The decision to handcuff McNeal is a discretionary function because Det. Sylva did not obey an order, rather Det. Sylva personally deliberated the decision. (ECF No. 27-3 at 25). Therefore, Det. Sylva is entitled to discretionary immunity as it relates to McNeal's negligence claim.

Assuming, *arguendo*, Lt. Flynn is not entitled to discretionary immunity, the court will address McNeal's negligence claim as it relates to the December 28, 2013, traffic stop.

As discussed above in the § 1983 claim discussion of the December 28, 2013, traffic stop, the court cannot, within the constraints of a motion for summary judgment, make a determination as a matter of law that Lt. Flynn's alleged use of excessive force was reasonable or that Lt. Flynn received consent to search McNeal's vehicle due to disputes of material fact. Indeed, this determination is better left to a jury. *See Frances*, 847 P.2d at 724. Thus, questions of fact impact the questions of proximate cause and reasonableness in this case. *See id.* The court therefore must deny Lt. Flynn's motion for summary judgment on McNeal's negligence claim.

### 2. *False imprisonment against Det. Tabor and LVMPD*

In their complaint, plaintiffs allege that Det. Tabor and LVMPD arrested plaintiffs without probable cause, constituting false arrest and false imprisonment. (ECF No. 10 at 13). The alleged false arrest and imprisonment occurred after defendants executed a search warrant at Rogalski's residence on August 30, 2013. (*Id.* at 6–7).

In their motion, defendants assert that plaintiffs' are estopped from litigating the issue of whether Det. Tabor and LVMPD had probable cause for the search warrant and arrests on August 30, 2013. (ECF No. 25 at 24–25). For the reasons set forth below, this court agrees.

The Ninth Circuit has held that a probable cause determination at a preliminary hearing bars relitigation of the issue. *Haupt v. Dillard*, 17 F.3d 285, 289 (9th Cir. 1994). When such a determination is made, it is "a final, conclusive determination of the issue," meaning a litigant is

prevented from raising the issue in a subsequent proceeding so long as "the parties in the two proceedings were the same or in privity." *Id.* at 288.

On September 15, 2014, a preliminary hearing was conducted at the Las Vegas Justice Court. (ECF No. 26-3). During the hearing, Rogalski's attorney cross-examined all of the State's witnesses, and argued that Rogalski was legally allowed to have the amount of marijuana found. (ECF Nos. 26-3, 26-4 at 52–59). Nevertheless, after hearing all of the testimony and reviewing the facts, the court found sufficient evidence that probable cause was established as to the search warrant executed on August 30, 2013, as well as the subsequent arrests and charges. (ECF No. 26-4 at 59).

Plaintiffs had a thorough and fair opportunity to litigate the issue of probable cause. *See Haupt*, 17 F.3d at 290. Accordingly, the court will grant summary judgment in favor of Det. Tabor and LVMPD with respect to plaintiffs' false imprisonment claim.

### 3. *Malicious prosecution against Det. Tabor and LVMPD*

Next, plaintiffs argue that Det. Tabor and LVMPD maliciously initiated the criminal proceedings against plaintiffs by deliberately ignoring Nevada medical marijuana laws. (ECF No. 10).

Under Nevada law, the elements of malicious prosecution are: "(1) want of probable cause to initiate the prior criminal proceeding; (2) malice; (3) termination of the prior criminal proceedings; and (4) damage." *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002). Plaintiffs' malicious prosecution claim similarly fails because Det. Tabor had probable cause to obtain and execute the search warrant, and arrest plaintiffs based on finding more plants than NRS § 453A.200 permitted. Therefore, plaintiffs are unable to establish the first element of their state malicious prosecution claim.

Furthermore, because Rogalski provides no new evidence that would preclude the determination of probable cause on which the search warrant, arrest, and charges were based, Rogalski is estopped from relitigating the issue of probable cause here as well. *See Haupt*, 17 F.3d at 290 n.5.

James C. Mahan
U.S. District Judge

- 18 -

1    Consequently, the court will grant summary judgment in favor of Det. Tabor and LVMPD

2    as to this claim.

3                    *4. Intentional infliction of emotion distress*

4        To state a claim for intentional infliction of emotional distress, a plaintiff must
         show: (1) defendant acted in an extreme and outrageous manner, (2) defendant
5        intended to or recklessly disregarded the probability that his conduct would cause
         plaintiff emotional distress, (3) plaintiff actually suffered extreme or severe
6        emotional distress, and (4) defendant's conduct caused plaintiff's distress.

7    *Mazzeo v. Gibbons*, 649 F. Supp. 2d 1182, 1201 (D. Nev. 2009); *see also Miller v. Jones*,

8    970 P.2d 571, 577 (Nev. 1998).

9        In the present case, defendants contend that plaintiffs have not provided any evidence to

10   support that defendants conduct was "extreme or outrageous." (ECF No. 25 at 39). Specifically,

11   defendants argue that Rogalski fails to demonstrate that their conduct "was taken with the intention

12   of or reckless disregard for causing her severe emotional distress." (*Id.* at 39–40). Defendants

13   also assert that McNeal has not sought any medical treatment for his emotional distress. (*Id.* at

14   40).

15       In response, plaintiffs assert that defendants acted with malice when defendants tore up

16   Rogalski's medical marijuana waiver and set off "flash bang" grenades towards plaintiffs' dogs.

17   (ECF No. 35 at 26). Additionally, McNeal asserts that defendants inflicted emotional distress

18   upon him when Lt. Flynn allegedly pointed a gun at him during a routine traffic stop. (*Id.*).

19       Under Nevada law, alleging "general physical or emotional discomfort" fail to satisfy the

20   extreme or severe emotional distress element. *Ferm v. McCarty*, No. 2:12-CV-00782-RFB, 2014

21   WL 6983234, at *7 (D. Nev. Dec. 9, 2014) (quoting *Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 462

22   (Nev. 1993). Here, plaintiffs provide no evidence of severe emotional distress or physical injuries.

23   *See* (ECF No. 35 at 26). Rather, plaintiffs simply discuss defendants' "malicious" conduct without

24   stating how that conduct caused plaintiffs' emotional distress. *See* (*id.*). Further, plaintiffs fail to

25   demonstrate that they actually suffered severe emotional distress. *See* (*id.*). Consequently,

26   plaintiffs fail to establish the third and fourth elements of the claim.

27       Accordingly, the court will grant summary judgment in favor of defendants as to plaintiffs'

28   intentional infliction of emotional distress claim.

**James C. Mahan**
**U.S. District Judge**

*5. Punitive damages*

Lastly, defendants contend that plaintiffs are not entitled to punitive damages because plaintiffs have not represented any evidence of "evil motive or intent on part of the individual officers." (ECF No. 25 at 40) (internal quotation marks omitted). Defendants also assert that LVMPD is immune from punitive damages. (*Id.*) (citing Nev. Rev. Stat. § 41.035; *City of Newport, v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)).

The burden now shifts to plaintiff to show that there is a genuine dispute of material fact as to their assertion for punitive damages. *See Celotex Corp.*, 477 U.S. at 323–24. Plaintiffs respond by asserting that whether punitive damages are awarded is a question for a jury to decide. *See* (ECF No. 35 at 27). Further, plaintiffs contend that pursuant to NRS § 42.101 "punitive damages are to be awarded where a [d]efendant is guilty of oppression, fraud or malice, express or implied." *See id.* (citing *Cerminara v. Cal. Hotel & Casino*, 760 P.2d 108, 111 (Nev. 1988)). However, plaintiffs have not alleged any claims for which defendants may be found guilty of which amount to oppression, fraud, or malice. *See* (ECF No. 10).

Ultimately, plaintiffs have failed to respond to defendants' argument here, and summary judgment will be granted in favor of the defendants as to this issue. *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

**IV.   Conclusion**

Based on the foregoing, the court will grant defendants' partial motion for summary judgment with respect to the following claims: (1) plaintiffs' § 1983 claim as it relates to the search and arrests on August 30, 2013; (2) plaintiffs' *Monell* claim; (3) plaintiffs' negligence claim against Sgt. Hunt, Det. Tabor, and LVMPD as it relates to the search and arrests on August 30, 2013; (4) McNeal's negligence claim against Det. Sylva as it relates to handcuffing McNeal during the December 28, 2013, traffic stop; (5) plaintiffs' false arrest and imprisonment, malicious prosecution, and IIED claims; and (6) the award of punitive damages.

In addition, the court will deny defendants' partial motion for summary judgment with respect to the following claims: (1) McNeal's § 1983 claim against Lt. Flynn and Det. Sylva as it

relates to the December 28, 2013, traffic stop; and (2) McNeal's negligence claim against Lt. Flynn as it relates to the December 28, 2013, traffic stop.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendants' motion for partial summary judgment (ECF No. 25) be, and the same hereby is, GRANTED IN PART AND DENIED IN PART, pursuant to the foregoing.

DATED August 7, 2017.

_____
UNITED STATES DISTRICT JUDGE